**PENNWALT CORPORATION, Appellant,**

v.

**PLOUGH, INC., Appellee.**

**No. 81–2071.**

United States Court of Appeals, Third Circuit.

Argued Jan. 13, 1982.

Decided April 8, 1982.

---

Matthew J. Broderick (argued), Aaron C. F. Finkbiner, III, Jane A. Soldoveri, Dechert, Price & Rhoads, Philadelphia, Pa., Richard D. Allen, Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellant.

Joseph A. Rosenthal, Morris & Rosenthal, Wilmington, Del., Donald H. Green (argued), Robert A. Skitol, John F. Daly, Wald, Harkrader & Ross, Washington, D. C., John R. Stewart, Richard E. Duerr, Jr., Memphis, Tenn., for appellee.

Before HUNTER and HIGGINBOTHAM, Circuit Judges, and WEINER,* District Judge.

* Honorable Charles R. Weiner, United States District Court for the Eastern District of Penn-

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal arises from Pennwalt Corporation's unsuccessful effort to obtain a preliminary injunction to prevent Plough, Inc., from running certain advertisements for its foot-care product, Aftate, until after those ads were reviewed by a panel of medical experts pursuant to a court-approved settlement agreement between the parties. It is Pennwalt's contention that Plough's ads constitute "efficacy representations" and, hence, are "covered claims" within the meaning of the settlement agreement. Because we have concluded that Plough's ads should have been submitted to the expert panel, we will reverse the order of the district court and remand for the entry of an order specifically enforcing the settlement agreement.

### I.

Pennwalt manufactures Desenex, an athlete's foot product, which is in competition with Plough's Aftate. Plough's 1979 advertisements for Aftate made direct comparisons to Desenex and asserted that it was a better product. In May of 1979, Pennwalt sued Plough under the Lanham Act alleging that Plough had made false, misleading and deceptive claims in its advertisements. Plough counterclaimed and, after lengthy discovery, the parties negotiated a settlement agreement. The district court, 516 F.Supp. 751, approved the agreement and dismissed the case without prejudice on April 24, 1981.

The settlement agreement establishes a procedure whereby "covered claims" are to be submitted to an expert panel for review before the claim is made in advertising. The settlement agreement defines a "covered claim" as:

> any efficacy representation, verbal, visual or otherwise, in which (i) either party makes specific reference to the other party's Covered Product, either alone or with

sylvania, sitting by designation.

other athlete's foot products, by name or other reference, in an unfavorable comparison with the advertiser's own Covered Product, or (ii) either party states that "Nothing is better than" a Covered Product, that "Nothing is better than the medicine in" a Covered Product, or any like phrase containing "better than" or synonyms for "better than," or (iii) either party states that a Covered Product is "the best" athlete's foot product or contains "the best" medicine.

Efficacy, in turn, is defined as "(i) effectiveness in treating or relieving any sign or symptom of athlete's foot, (ii) ability to control or cure athlete's foot, (iii) effectiveness in preventing the occurrence or recurrence of athlete's foot or (iv) overall effectiveness in treating, controlling, curing, and/or preventing athlete's foot." The function of the expert panel is to determine whether a covered claim has a "substantial and reliable medical and scientific basis." If in the opinion of the expert panel the covered claim is without medical and scientific basis, the sponsoring party agrees to withdraw any advertisement containing such a claim.

Plough began its 1981 advertising campaign without submitting its claims to the expert panel and scarcely five weeks after the 1979 lawsuit was dismissed, Pennwalt filed the present action seeking to force Plough to comply with the settlement agreement. Plough's pre-settlement and post-settlement ads read as follows:

| 1979 Plough Ad | 1981 Plough Ad |
|---|---|
| Aftate for Athlete's Foot is better than Desenex. Really better. If you've got athlete's foot and you're still using Desenex, you should know that Aftate is better. In independent studies, *the medication in Aftate* has been proven to be *more effective* in killing athlete's foot fungus than medication in Desenex. In fact, *doctors recommend the medication* | Aftate for Athlete's foot. *With the medication doctors prescribe 10 to 1 over that in Desenex.* Aftate kills athlete's foot fungi on contact. It contains Tolnaftate, a *most effective medication* against athlete's foot, and it's available without a prescription. Aftate speeds healing of raw cracked skin and helps prevent reinfection. *Doc-* |

*in Aftate 14 to 1 over the medication in Desenex.* 14 to 1. Aftate is better than Desenex. Really better. It's the killer. (Emphasis added)

*tors prescribe the medication in Aftate 10 to 1 over that in Desenex.* (Emphasis added)

The question then is whether Plough's statement that "Doctors prescribe the medication in Aftate 10 to 1 over that in Desenex" constitutes a covered claim within the meaning of the settlement agreement.[1]

## II.

The district court properly noted that the settlement agreement is a contract and subject to the rules of contract interpretation. As such, our standard of review of the district court's interpretation of the contract is plenary. *Jersey Central Power & Light Co. v. Local Unions, IBEW*, 508 F.2d 687 (3d Cir. 1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976); *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770 (3d Cir. 1972).

The trial judge had no hesitation in determining that Plough's 1981 ad is a comparative claim and "that someone reading or hearing the claim is expected to infer from it that Aftate is more effective in treatment than Desenex." Nevertheless, the trial judge held that the parties did not intend inferences or implications to be considered as covered claims. Rather, he concluded that only "claims [making] direct representations as to comparative efficacy were intended to be covered claims." In support of this conclusion, the trial court reasoned that an ad which requires only "a slight background in statistics, rather than any medical or scientific training" would logically not be meant for an expert panel.

The trial court's interpretation of the settlement agreement is not without plausibility as this is a close case. However, after careful consideration of the briefs and oral argument, we have concluded that Plough's 1981 ad *does* make an efficacy representation and should have been sent to the panel as a covered claim.

---

1. The ads set forth in the text are those used by Plough in magazines such as Playboy, Omni and Sports Illustrated. Similar ads were also run on television.

■ The parties to this action are sophisticated corporations which have voluntarily created an expert forum charged with evaluating factual medical and scientific claims. The underlying assumption of the settlement agreement is that the panel will assess such claims with a special expertise not usually possessed by lay persons. There is a strong judicial policy in favor of parties voluntarily settling lawsuits. *Autera v. Robinson*, 419 F.2d 1197 (D.C.Cir. 1969); *Petty v. General Accident Fire & Life Assurance Corp.*, 365 F.2d 419, 421 (3d Cir. 1966); *Read v. Baker*, 438 F.Supp. 732, 735 (D.Del.1977). In *Autera*, the court stated the reason for this policy:

> Voluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial and the preparation and proceedings that must forerun it.

419 F.2d at 1199 (footnotes omitted). Furthermore, such agreements are specifically enforceable and broadly interpreted. *Kelly v. Greer*, 365 F.2d 669, 671 (3d Cir. 1966); *Read v. Baker*, 438 F.Supp. 737, 741 (D.Del. 1977), aff'd., 577 F.2d 728 (3d Cir.), *cert. denied*, 439 U.S. 869, 99 S.Ct. 197, 58 L.Ed.2d 180 (1978). Of course, it is axiomatic in interpreting contractual agreements that the parties' intent, where clearly articulated, controls what is or is not covered by the agreement.

■ Turning then to the question of whether the 1981 ad includes a covered claim, we find several factors which lead us to the conclusion that the parties intended ads like the one in question to be covered. Our reading of the agreement reveals no indication that the parties intended to limit coverage to only *direct* representations of comparative efficacy. It is at least as plausible that the 1981 ad contained covered claims as contemplated by the parties as it is that the parties did not intend inferences to ·be covered. We note that the claims

made in the 1981 ad fit squarely within the definition of efficacy. Although the 1981 ad makes no direct comparison, it does make specific reference to Desenex. The ad leads the reader to the clear conclusion that, on comparison, Aftate is better than Desenex, at least in the minds of physicians. The ad also claims that the medicine in Aftate is "most effective." Simply stated, the claim that "Doctors prescribe the medication in Aftate 10 to 1 over that in Desenex" constitutes "an unfavorable comparison" logically inferable as within the meaning of the agreement. If the parties did not intend unavoidable inferences and conclusions to be included within the definition of covered claims, they should have drafted the agreement with more precision.

A further reason which convinces us that the parties intended claims such as those made in the 1981 ad to be sent to the panel is the nature of the representation made in the 1981 ad. Unlike the district court, we do not believe that only a "slight background in statistics" is needed to correctly judge the truthfulness and accuracy of the ad. As counsel for Pennwalt stated at oral argument, Plough compared two separate sections of the National Prescription Audit to come up with its 10 to 1 figure. For its product, Plough looked under topical fungicides and found approximately 260,000 prescriptions for Tolnaftate. Plough then turned to a section on proprietary foot remedies where it found that Desenex was prescribed 26,000 times. We are not conversant with the National Prescription Audit and cannot judge on this record the validity of Plough's use of it. Furthermore, we have no knowledge of whether topical fungicides have broader uses than proprietary foot remedies. It is logical to assume that these are questions that persons with medical and scientific expertise could answer and that the answers will bear on the substantial and reliable medical and scientific basis for the claim. Indeed, at oral argument counsel for Plough candidly admitted "We don't know, and I don't know as a matter of record or not record, as to why doctors prescribe the medication, Tolnaftate." Given the strong judicial policy in favor of enforcing voluntary settlement

agreements and the technical nature of the questions which the 1981 ad raises, it was error for the district court to conclude that Plough's 1981 ad was not of the type intended by the parties to go to the expert panel.

### III.

Having decided that Plough's 1981 ads were covered claims as defined by the settlement agreement, we will reverse the order of the district court and remand with instructions that until such time as the 1981 ad is evaluated by the expert panel, Plough should be enjoined from using the advertisement in question.