**SHARON STEEL CORPORATION,**
Appellant,

v.

**JEWELL COAL AND COKE COMPANY.**

No. 83–5611.

United States Court of Appeals,
Third Circuit.

Argued May 15, 1984.

Decided June 1, 1984.

Walter T. McGough (argued), W. Thomas McGough, Jr., David Ziegler, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

Joseph A. Katarincic (argued), Michael R. Plummer, Neal R. Brendel, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for appellee.

Before GIBBONS and HUNTER, Circuit Judges, and STAPLETON, District Judge.[*]

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Sharon Steel Corporation appeals from the denial of its petition to compel arbitration in a contractual dispute with Jewell Coal & Coke Company. The district court ruled that Sharon's commercial impracticability claim did not constitute the sort of force majeure claim that the contract referred to arbitration. Because we hold that Sharon raised a prima facie claim of arbitrability we will reverse and remand.

### I. Facts

On July 1, 1978, the parties signed an agreement under which Jewell would supply Sharon with one hundred and twenty thousand tons of coke per year for a period of five years. Various provisions in the agreement dealt with quality, shipping, and renegotiation terms. Paragraph 7 dealt with price, and provided that the basic price of eighty-five dollars per net ton would be adjusted quarterly in accordance with a set formula attached to the agreement. The formula divided the price of the coke into seven elements: labor, royalties, equipment, trucking, power, black lung expense and other. Each element was classified according to its contribution to the total base price. Then the formula specified an escalation index for each element. For example, the labor index consisted of the percentage increase in daily wage rates for workers covered by the National Bituminous Coal Wage Agreement. The equipment index was prepared from the "Mining Machinery and Equipment" tables in the Bureau of Labor Statistics compilation of *Producer Prices and Price Indexes.* As the appellees note, the formula seems designed to reflect changes in the production costs of coke, not changes in the market price.[1]

The Agreement also contained a *force majeure* provision. Paragraph 10(a) and (b) specified instances in which failures to comply with the Agreement would be excused. Paragraph 10(b) is labeled "Force Majeure Affecting Performance by Buyer," and it recites that performance will be excused upon the occurrence of various specified factors that "render performance commercially impracticable." The last of the

---

[*] Hon. Walter K. Stapleton, United States District Judge for the District of Delaware, sitting by designation.

1. The only conceivable exception is the "Other Cost" element and index, which was derived from the "Industrial Commodities" Price Index of the National Producer Prices Index. This element comprised three percent of the base price of the coke. Of course, it is far more credible to assume that this element applied to other costs incurred by the producer than to changes in the market price of coke.

factors listed is simply "any other cause beyond buyer's reasonable control." [2]

Paragraph 10(c) provides for arbitration of commercial impracticability disputes.[3] It is echoed by Paragraph 11 which states:

11. *Arbitration.* All disputes as to quality pursuant to paragraph 4 hereinabove, determination of changes in price and renegotiation of price pursuant to paragraph 7 hereinabove and as to any claim of commercial impracticability pursuant to paragraph 10 hereinabove shall be submitted to, and settled by, arbitration. Such arbitration shall be effected by arbitrators selected as hereinafter provided and shall be conducted in accordance with the rules, existing at the date thereof, of the American Arbitration Association. The dispute shall be submitted to three arbitrators, one arbitrator being selected by Buyer, one by Seller, and the third by the two so selected by Buyer and Seller, or, if they cannot agree on a third, by the American Arbitration Association ....

Both parties observed their contractual obligations until January 11, 1983. On that day Sharon wrote to inform Jewell that "drastic changes in the circumstances which existed at the time the contract was entered into have relieved Sharon from further obligation to perform under the contract." The letter continues:

2.     (b) *Force Majeure Affecting Performance by Buyer.* Buyer's failure to comply or delay in compliance with the terms and conditions of this agreement shall be excused if due to any of the following which render performance commercially impracticable: act of God, fire, flood, strike, work stoppage, labor dispute, accident or mill interruption, complete or partial blast furnace relining, temporary failure of supply of iron ore, pellets or flux, any action by governmental authority, including ecological authorities, or any other cause beyond Buyer's reasonable control.

3.     (c) *Dispute as to Force Majeure.* If either Buyer or Seller shall claim that its performance hereunder is excused in whole or in part, temporarily or permanently, by reason of an event of commercial impracticability, and if the other party or parties hereto shall dispute such claim, such dispute shall be submitted to binding arbitration as hereinafter provided.

The coke shortage contemplated at the time of the contract never materialized, and this, we believe, has made performance of the contract both impossible and economically unfeasible. In consequence, the purpose of the contract has been frustrated and it would be unconsionable [sic] for Sharon to be required to continue to purchase coke under contractual terms and conditions which would severely penalize Sharon.

App. at 81a. Apparently, the depressed conditions in the steel industry had lowered the market price of coke to a point well below that set by the Agreement.

Jewell treated the letter as an anticipatory breach, and filed suit in the U.S. District Court for the Western District of Virginia to enforce the contract. That suit remains pending.[4] Sharon responded by filing a suit to compel arbitration in the Western District of Pennsylvania. Jurisdiction was based on diversity of the parties and on the Federal Arbitration Act, 9 U.S.C. § 1 et seq.[5] The court denied the Order denying the motion to compel arbitration.

## II. Review of Arbitration Clauses

▌   The district court correctly took note of the strong federal policy favoring arbitration.[6] *See generally United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Prima Paint Corp. v. Flood & Conklin*

4.   The appellee informs us that the Virginia court denied Sharon's motion for a stay and its motion for a dismissal following the denial in Pennsylvania of the Petition to Compel Arbitration. Discovery on the merits is now proceeding in that action. Appellee's br. at 7.

5.   The Agreement specifies Pittsburgh as the site of the arbitration. Sharon brought its suit in the Western District because of the doctrine that suits to compel arbitrations should be brought in the same district where the arbitration is set to take place. *See Lawn v. Franklin,* 328 F.Supp. 791, 793–94 (S.D.N.Y.1971).

6.   The ultimate arbitrability of a contract is a matter of federal substantive law. *Becker Autoradio v. Becker Autoradiowerk,* 585 F.2d 39, 43 (3d Cir.1978).

*Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). That policy was most recently reaffirmed by the Supreme Court in *Moses H. Cone Hospital v. Mercury Construction Co.,* 460 U.S. 1, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) (any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration). As Judge Lacey has put it, the Arbitration Act "reflects a legislative determination of the desirability of arbitration as an alternative to litigation." *Singer Co. v. Tappan Co.,* 403 F.Supp. 322 (D.N.J.1975); *aff'd mem.* 544 F.2d 513 (3d Cir.1976).

The instant case illustrates one of the reasons for that policy. The appellant alleges that implicit in the adoption of the coke price formula was an assumption that the formula would yield prices in line with the prevailing market prices. *Cf.* U.C.C. 2–615(a) (1977), 13 Pa.Cons.Stat.Ann. § 2615(1) (Purdon 1979 & Supp.1983) (impracticability measured by "occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made"). An interpretation of the arbitration clause in this contract must take notice of the fact that an arbitrator with a background in such agreements is probably in a better position to judge the plausibility of such a claim than is a federal judge or a jury.

The district court recognized these considerations, but still declined to grant the motion to compel arbitration. It relied on the interpretive maxim of *ejusdem generis.* Since each of the specific events mentioned in the *force majeure* clause—fire, flood, work stoppage, etc.—related to an occurrence that would reduce Sharon's need for coke, he reasoned, the "any other cause" language must have been limited to other

causes that similarly affect Sharon's needs for coke. Since a drop in the market price didn't make a difference in Sharon's needs, the court reasoned that it necessarily could not have been intended to be an instance of commercial impracticability.[7]

■ This is a reasonable interpretation of the contract, and it may well prove to be the correct one.[8] However, we do not believe that it was appropriate for the district court to make it. So long as the appellant's claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator. *Cf. United Steelworkers v. Warrier & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) ("[a]n order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage"); *quoted in Bristol Farmers Market v. Arlen Realty,* 589 F.2d 1214, 1218–19 (3d Cir.1978). *See also, Stateside Machinery Co. v. Alperin,* 591 F.2d 234, 240 (3d Cir.1979) ("doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration."); *United Engineering and Foundry Employees v. United Engineering & Foundry Co.,* 389 F.2d 479, 481–2 (3d Cir.1967).

■ Certainly Sharon has presented a plausible interpretation of the contract. It may well be that the common assumption of the parties was that the contract-generated price would remain roughly equivalent to the market price. However, it is very difficult to conclude that the parties felt that the contract formula would track

---

7. "The only thing precluding Sharon's performance is the bitterness of paying Jewell more than it would need to pay on the market. Sharon does not claim that its blast furnace is out of order, or that ore is unavailable or that the formula is being misapplied.... It merely equates general economic conditions with force majeure." Slip op. at 4, App. at 87a.

8. *Cf. Neal Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 293–94 (7th Cir.1977);

*Hancock Paper Co. v. Champion Int'l Co.,* 424 F.Supp. 285 (E.D.Pa.1976); *Publicker Industries, Inc. v. Union Carbide Co.,* 17 U.C.C.Rep. 989 (E.D.Pa.1975) (changes in market price do not excuse failure to perform). *But see Aluminum Co. of America v. Essex Group, Inc.,* 499 F.Supp. 53 (W.D.Pa.1980) (change in market price can support a claim of commercial impracticability).

sharp fluctuations in the market price. Discovery of documents and conversations could yield a picture of the parties' intentions at variance with the implications of *ejusdem generis* approach. *Cf. Singer Co. v. Tappan Co.*, 403 F.Supp. 322, 329 (D.N. J.1975), *aff'd*, 544 F.2d 513 (3d Cir.1976) (courts determining the scope of an arbitration clause should not rely on traditional rules of statutory construction). That being the case, the district court should have referred the dispute to the arbitrators.

 The heart of the problem in this case is the fact that the question of arbitrability is intertwined with the merits of the commercial impracticability claim. But the Federal Arbitration Act gives the arbitrator the power to determine the scope of the arbitration clause as well as the substantive merits of the claim. *See Acevedo Maldonado v. PPG Industries*, 514 F.2d 614, 617 (1st Cir.1975) ("the arbitrator must ultimately pass on the outer boundaries of what is arbitrable.") If anything, a case in which the scope of arbitrability affects the merits of the claim is a stronger candidate for an arbitration. For the district court to hold that the dispute is not arbitrable because the parties did not intend a particular circumstance to trigger the exculpatory clause that, in turn, triggers the arbitration proceedings, would risk a collateral estoppel on the substantive claim. That would be an undesirable result, especially where, as here, the court's purported ruling on the arbitration clause relied almost entirely on the pleadings.

### III. Conclusion

We therefore hold that in this case the arbitrability of appellant's claim—as well as the substantive merits—properly belonged to the arbitration panel specified in the contract. The decision of the district court will be reversed and the case remanded for the entry of an order compelling arbitration pursuant to 9 U.S.C. § 4.